1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10   HARVEY BENJAMIN BACHAND,            )   Case No. CV 14-5120-PJW
                                         )
11              Plaintiff,               )
                                         )   MEMORANDUM OPINION AND ORDER
12        v.                             )
                                         )
13   CAROLYN W. COLVIN,                  )
     Acting Commissioner of the          )
14   Social Security Administration,     )
                                         )
15              Defendant.               )
                                         )
16   _____)

17                          I.   INTRODUCTION

18        Plaintiff appeals a decision by Defendant Social Security

19   Administration ("the Agency"), denying his application for disability

20   insurance benefits ("DIB").  He claims that the Administrative Law

21   Judge ("ALJ") erred when he: (1) discounted Plaintiff's testimony;

22   (2) rejected a treating doctor's opinion; and (3) accepted the

23   vocational expert's testimony.  For the following reasons, the Court

24   concludes that the ALJ did not err.

25                      II.   SUMMARY OF PROCEEDINGS

26        In October 2011, Plaintiff applied for DIB, alleging that he had

27   been disabled as of December 2007, due to migraine headaches, pain

28

throughout his body, insomnia, and diabetes.  (Administrative Record ("AR") 125-26, 156.)  After his application was denied, he requested and was granted a hearing before an ALJ.  (AR 57-67, 78, 99, 114.)  In March 2013, he appeared with counsel and testified at the hearing. (AR 28-56.)  Thereafter, the ALJ issued a decision denying benefits. (AR 12-23.)  Plaintiff appealed to the Appeals Council, which denied review.  (AR 1-3.)  He then commenced this action.

III.  ANALYSIS

A.   The ALJ's Credibility Determination

Petitioner testified that his pain and limitations prevented him from lifting any appreciable weight and from standing, walking, and sitting for any length of time.  (AR 44-45.)  The ALJ found that this testimony was not entirely credible.  (AR 19-21.)  Plaintiff argues that the ALJ erred in doing so because he based this finding solely on the fact that there was no objective medical evidence to support the testimony.  (Joint Stip. at 16.)  For the reasons explained below, the Court finds that the ALJ cited sufficient reasons for discounting Plaintiff's testimony.

ALJs are tasked with judging a claimant's credibility.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  In doing so, they can rely on ordinary credibility techniques.  *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).  Where there is no evidence of malingering, however, ALJs can only reject a claimant's testimony for specific, clear, and convincing reasons that are supported by substantial evidence in the record.  *Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014).

The ALJ cited numerous reasons for discounting Plaintiff's testimony: (1) there was no correlation between the medical record and

2

Plaintiff's onset date; (2) the objective evidence did not support Plaintiff's claims of disabling pain; (3) Plaintiff's treatment was conservative; (4) there were gaps in treatment; (5) Plaintiff's daily activities contradicted his claims of disabling pain; and (6) Plaintiff was able to work part-time in 2011.  (AR 19-21.)

These are legally valid reasons to question a claimant's testimony.  *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (holding ALJ can consider claimant's ability to perform daily activities and gaps in medical treatment in evaluating claimant's testimony); *Bray v. Commissioner of Social Security Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (finding claimant's part-time work as personal caregiver belied claim of debilitating respiratory illness); *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (noting conservative treatment, including use of only over-the-counter medication to control pain, supported discounting claimant's testimony regarding pain); *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (affirming ALJ's adverse credibility finding based in part on fact that claimant left his job because he was laid off, not because he could no longer work); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (noting ALJ can consider objective medical evidence in determining credibility of claimant).  Further, some of them are supported by the record.

For instance, there is very little in the medical record to explain what caused Plaintiff to become disabled in December 2007. According to Plaintiff, his pain had persisted for years.  As the ALJ pointed out, though one of Plaintiff's doctors noted in 2007 that he could no longer work as a construction electrician, he was not working as a construction electrician when the doctor offered that opinion.

1  (AR 19, 559.)   In fact, he had stopped working as a construction
2  electrician four years earlier, in 2003.  (AR 33.)

3      Plaintiff's explanation for quitting was equally vague, i.e., "my
4  back and legs just couldn't take it anymore."  (AR 38.)   Though it is
5  reasonable that someone with severe pain would eventually reach a
6  point where he felt it was no longer possible to work, the ALJ was
7  free to question that explanation where, as here, the record did not
8  provide any objective support for the shift.

9      The ALJ also relied on the fact that Plaintiff received
10 conservative care for his purportedly disabling pain.   His treatment
11 consisted primarily of a TENS unit, physical therapy, and Tylenol.
12 (AR 39, 558.)   The ALJ properly considered this fact in evaluating
13 Plaintiff's pain testimony.[1]

14     The ALJ also focused on gaps in Plaintiff's care.   Between 2008
15 and 2012, Plaintiff's treatment was sporadic, at best.  (AR 363-547.)
16 During that time frame, he went for long periods without receiving any
17 medical care for his pain.   And many of his doctor's visits during
18 this time frame were for other ailments, not his back and leg pain.

19     The ALJ pointed out in detail how some of the medical records did
20 not support Plaintiff's claims or contradicted them.   He noted that
21 Plaintiff generally reported to his doctors that he was feeling well
22 between 2008 and 2012.  (AR 20.)   The record supports this finding.

23     As to the ALJ's remaining reasons for questioning Plaintiff's
24 testimony, i.e., that he was able to perform various daily activities

25

26     [1]  Plaintiff testified at the hearing that he was taking
   Meloxicam, a prescription, non-steroidal, anti-inflammatory drug.  (AR
27 40.)  The medical records from 2007 showed that he was only taking
   Tylenol because he was unable to take non-steroidal, anti-inflammatory
28 drugs due to an ulcer.  (AR 558.)

4

and that he worked part-time in 2011 for several weeks, the Court does not find them persuasive.  With regard to daily activities, i.e., cooking an occasional meal, taking out the garbage, driving to a meeting several times a month, etc., nothing about them establishes that Plaintiff was exaggerating his claims of pain or that his ability to perform them suggested that he could function in the workplace. *See Orn*, 495 F.3d at 639 ("The ALJ must make specific findings relating to the daily activities and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination") (internal quotation marks omitted).  The same is true about Plaintiff's ability to work at a law firm for two hours a day in 2011, contacting union members for the firm.  (AR 41.)  Nothing about that job contradicts Plaintiff's pain testimony.

In the end, of the six reasons cited by the ALJ for questioning Plaintiff's testimony, the Court finds that four of them are supported by the record.  These four reasons are enough to uphold the ALJ's credibility finding in this case.  *See Carmickle v. Comm'r, Soc. Sec.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008).  The lack of objective medical evidence to support Plaintiff's claim that he was disabled (and that his disability started in December 2007) combined with the fact that he was treated conservatively and sporadically throughout the relevant period for allegedly disabling pain supports the ALJ's finding that Plaintiff was exaggerating his claims of pain.  For that reason, it is affirmed.

2.   The ALJ's Rejection of the Treating Doctor's Opinion

Plaintiff's treating doctor, Dr. Rod Blau, filled out a residual functional capacity questionnaire in July 2012, providing his assessment of Plaintiff's capabilities.  (AR 548-54.)  He indicated

5

that Plaintiff suffered from carpal tunnel syndrome, impingement in
both shoulders, and osteoarthritis in his knees and hips. (AR 548.)
Dr. Blau also opined that Plaintiff would be severely limited in his
ability to sit, stand, and lift and would likely be absent from work
more than three times a month due to his medical conditions. (AR 548-
54.)

The ALJ rejected this opinion because: (1) it was not supported
by Dr. Blau's records or the records of the other medical care
providers; (2) it was based on Plaintiff's statements to Dr. Blau,
which the ALJ discounted; and (3) it was inconsistent with other
statements Plaintiff made to Dr. Blau, which the ALJ had accepted.
(AR 16-17, 20.) Plaintiff contends that the ALJ erred in rejecting
Dr. Blau's opinion. (Joint Stip. at 22-25.) For the following
reasons, the Court disagrees.

The ALJ properly questioned Dr. Blau's opinion because it was
based, at least in part, on what Plaintiff had told him, which the ALJ
had rejected. This is a legitimate reason for discounting a doctor's
opinion. *See Bray*, 554 F.3d at 1228 (affirming ALJ's discounting of
treating doctor's opinion that was based on claimant's subjective
characterization of her symptoms which the ALJ found was not
credible).

So, too, is the ALJ's finding that Dr. Blau's opinion was
inconsistent with Plaintiff's statements that the ALJ *did* accept. For
example, though Dr. Blau diagnosed Plaintiff with carpal tunnel
syndrome, Plaintiff testified that he had had surgery to resolve his
carpal tunnel and did not "have any issues" with it. (AR 47.) This
testimony seems to contradict Dr. Blau's diagnosis. Though Dr. Blau
did not assess any limitations for carpal tunnel, it calls into

question his assessment in that clearly one of the three diagnoses he made was contradicted by Plaintiff's testimony.

The ALJ found generally that Dr. Blau's opinion was not supported by his own medical records. (AR 19-20.) This is also a valid reason for questioning Dr. Blau's findings and is supported by the record. For example, the ALJ noted that there was no support in Dr. Blau's records for the diagnosis of impingement in both shoulders. (AR 17.) The Court has not found any reference to shoulder impingement in Dr. Blau's or any of the other medical records and Plaintiff has not pointed to any references, either. He does point to the fact that he told Dr. Blau in 2011 that he had had surgery on his right shoulder in 1998, but that does not amount to a medical record establishing shoulder impingement nor does it support Dr. Blau's 2012 diagnosis that Plaintiff had impingement in both shoulders. (AR 278.) Like the ALJ, the Court sees a contradiction between Dr. Blau's 2012 diagnosis of shoulder impingement and literally hundreds of pages of treatment records from Dr. Blau and others at Kaiser over a period of years in which Plaintiff was never diagnosed with or treated for shoulder impingement.[2]

The ALJ also questioned Dr. Blau's opinion because it was incompatible with "the record as a whole." (AR 20.) Plaintiff rightly complains that the ALJ's finding here was too general. Though, by reading the ALJ's decision, it is possible to have a general understanding about what he was referring to, he should have

---

[2] When Dr. Blau submitted a doctor's statement to the Plaintiff's union in 2007 so that Plaintiff could go on disability, he diagnosed Plaintiff with arthritis of the knees and "leg length" disparity. (AR 564.) He never mentioned shoulder impingement. (AR 564.)

explained in detail what he meant when he made this sweeping

statement.

Even assuming, however, that the Court ignores this reason for

rejecting Dr. Blau's opinion, there is still enough here to affirm the

ALJ's finding.  Most compelling is the fact that Dr. Blau's own

records from Kaiser do not support his opinion that Plaintiff is

incapable of doing even sedentary work.  Plaintiff was not telling his

doctors, including Dr. Blau, that this was the case and his doctors

were not treating him as someone with disabling pain and limitations.

For these reasons, the ALJ's rejection of Dr. Blau's opinion will be

upheld.

> 3.   The ALJ's Reliance on the Vocational Expert

The vocational expert testified that Plaintiff could perform

light work, including his former job as a union business

representative as he performed it.  Plaintiff contends that the

vocational expert erred in reaching that conclusion because Plaintiff

was required to lift ladders weighing between 25 and 50 pounds as a

union representative and he is only capable of lifting up to 20

pounds.  (Joint Stip. at 6-7.)  For the following reasons, this

argument is rejected.

When initially asked by the ALJ at the administrative hearing

whether he had to lift anything as a union representative, Plaintiff

testified "No."  (AR 33.)  When his lawyer thereafter questioned him,

Plaintiff repeated that answer.  (AR 41.)  Counsel probed deeper,

reminding Plaintiff that he had submitted a work activity report in

which he had claimed that he had to lift as much as 50 pounds on that

job.  (AR 41.)  Plaintiff explained that he "might have moved some

1  boxes, files or something like that but that wasn't typically the
2  job." (AR 41-42.)  Undaunted, counsel pressed on:
3      Q:   You also indicated that you frequently had to lift 25
4           pounds, would that be true?
5      A:   I think it was more -- I guess I understood the question as
6           to what I could lift, I don't -- really wasn't lifting that
7           much, I mean -- you know, you -- a files [sic] and a
8           briefcase maybe --
9      Q:   You made a remark that sometimes you'd have to carry
10          ladders?
11     A:   If I was on a jobsite if I -- sometimes I had to get up into
12          a space where the electricians were to do interviews and
13          stuff like that I'd have to climb stairs or even use a
14          ladder once in a while --
15     Q:   Did you --
16     A:   -- climb a ladder to get where they were.
17     Q:   -- inspect any of the work that they did?
18     A:   Not particularly, no.
19  (AR 41-42.)
20      The ALJ later followed up:
21     Q:   [W]hen you were working as a business representative for the
22          union, I'm trying to get clear on your testimony, you
23          actually -- you climbed ladders, but you didn't lift them,
24          or you did lift ladders, or what?
25     A:   I lifted them once in a while if I had to get a ladder to
26          get up to an attic space or somewhere where there was
27          construction going on to see the electricians, to see what
28

1          they were doing, you know, and to interview them.  But that

2          was very seldom.

3  (AR 48.)

4      Plaintiff subsequently testified that the ladders weighed 20-25

5  pounds.  (AR 49-50.)  Based on this testimony, the vocational expert

6  concluded that Plaintiff's performed his job as light work and that he

7  could still perform it today.  (AR 50-51.)

8      Plaintiff takes exception to the vocational expert's conclusions.

9  He refers the Court back to his work history report, in which he

10  represented that the job required him to lift up to 50 pounds, and

11  argues that the hearing testimony established that the ladders weighed

12  25 to 50 pounds.  (Joint Stip. at 6-7.)

13      Plaintiff's argument is contradicted by the record.  According to

14  Plaintiff's testimony, the ladders weighed between 20 and 25 pounds,

15  not 25 and 50.  (AR 49-50.)  Further, as Plaintiff made clear in his

16  testimony, he seldom ever had to lift anything, including a ladder, as

17  lifting was not really part of his job.  Thus, the vocational expert's

18  opinion that Plaintiff was capable of performing his prior job as he

19  performed it despite the fact that he might have to lift a ladder on

20  occasion is supported by substantial evidence in the record and is

21  affirmed.[3]

22

23      [3]  Plaintiff complains that the vocational expert erred when she
relied on the Dictionary of Occupational Titles to determine the
24  duties of the job as performed nationally because the job description
is outdated.  The Court need not and does not reach this issue because
25  it has concluded that Plaintiff can perform the job as actually
performed.  Plaintiff also takes issue with the vocational expert's
26  testimony that an individual limited to only occasional overhead
reaching could perform Plaintiff's past work as a union representative
27  "per the DOT and as performed."  (Joint Stip. at 11-12; AR 50.)  In
his description of the job, however, Plaintiff represented that it
28  involved reaching for no more than two hours a day (AR 165), of which

1

IV.   CONCLUSION

2     For these reasons, the Agency's decision is affirmed and the case

3 is dismissed with prejudice.

4     IT IS SO ORDERED.

5     DATED: February 9, 2016.

6

7

8                                        _____

9                                        PATRICK J. WALSH
                                         UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24 S:\PJW\Cases-Social Security\BACHAND, 5120\Memo Opinion and Order.wpd

25

26 _____

27 it seems clear reaching overhead encompassed only a fraction of that
   time.  As such, the vocational expert's testimony that an individual
   limited to only occasional, i.e., up to one-third of the time,
28 overhead reaching could perform the job as Plaintiff actually
   performed it is supported by the record.

11